1

2

3

4

5

6

7

8                                   UNITED STATES DISTRICT COURT

9                            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,                    No.  2:13-CR-00050-KJM

12                         Plaintiff,

13           v.                                     ORDER

14    ZHIQIANG LIU, et al.,

15                         Defendant.

16

17           The following motions are currently pending before the court:  (1)  a motion to

18    suppress evidence derived from a GPS warrant issued on October 25, 2012 by the Sacramento

19    County Superior Court, filed by defendant Qinghong Li and joined by defendant Shihong Chen,

20    ECF Nos. 71, 86; (2) a motion to suppress observations from a vehicle stop on February 21, 2012,

21    filed by defendant Li and joined by defendant Chen, ECF Nos. 79, 86; (3) a motion to suppress

22    evidence obtained as the result of a GPS warrant  issued on November 16, 2012 by the duty

23    magistrate judge, filed by defendant Li and joined by defendant Chen and in part by defendant

24    Zhiqiang Liu, ECF Nos. 80, 82, 86;  (4)  a motion to suppress evidence derived from the federal

25    GPS warrant filed by defendant Liu and joined by defendant Chen, ECF Nos. 82, 86; (5) a motion

26    to dismiss the indictment, arguing the government's marijuana policies are arbitrary within the

27    meaning of the Fifth Amendment and violate the doctrine of equal sovereignty, filed by all

28    defendants,  ECF No. 87; (6) a motion to suppress evidence derived from "a police sniff and

1

1  listening" outside Cliffcrest Drive on December 10, 2012 and outside McKenna Drive on October

2  23, 2013, filed by defendant Li and joined by defendant Chen, ECF Nos. 94, 86; (7) a motion to

3  suppress all evidence obtained from a residence on McKenna, seized as a result of federal search

4  warrant 2:13-sw-0053, filed by defendant Li and joined by defendant Chen, ECF No. 95; and

5  (8) a motion to suppress evidence seized from the search of Gwerder Court, filed by defendant

6  Jun Mou Peng, ECF No. 96.  At hearing, defendant Liu joined in all of defendant Li's motions.

7        The government has filed an omnibus opposition to the motions.  Opp'n, ECF

8  No. 97.  Defendant Chen has filed a reply.  ECF No. 98.

9        The court heard argument on July 9, 2014, Olusere Olowoyeye appeared for the

10  government: Douglas Beevers appeared for Qinghong LI; Keith Staten appeared for Zhinqiang

11  Liu; Mark Reichel appeared for  Shihong Chen; and Chris Cosca appeared for Jun Mou Peng.  All

12  defendants were present and were assisted by the Cantonese interpreter.

13        After considering the parties' arguments, the court DENIES the motions to

14  suppress and the motion to dismiss.

15  I.  THE MOTIONS TO SUPPRESS

16        The three warrants in this case built on the information presented in and evidence

17  derived from the earlier warrants, as well as evidence secured through a vehicle stop and the

18  "sniff" outside two houses.  After addressing the threshold question of standing, the court

19  describes each event separately below and then addresses the parties' challenges to that particular

20  event.

21      A.   Standing—The Reasonable Expectation of Privacy

22        A defendant who claims that government action violated his or her Fourth

23  Amendment rights must generally demonstrate that he or she had a "legitimate expectation of

24  privacy" in the place searched or the thing seized and that this expectation is one society

25  recognizes as legitimate. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Bautista*,

26  362 F.3d 584, 589 (9th Cir. 2004).  Courts generally use the term "standing" to refer to this

27  reasonable expectation of privacy, even though the concept "is analytically distinct from 'case or

28  controversy' standing in the Article III context."  *United States v. Ewing*, 638 F.3d 1226, 1230

2

1   (9th Cir. 2011).  The Ninth Circuit has said Fourth Amendment standing "is not jurisdictional,"

2   *United States v. Garcia-Villalba*, 585 F.3d 1223, 1234 n.6 (9th Cir. 2009), and thus "may be

3   bypassed in favor of the merits," *Ewing*, 638 F.3d at 1230, or "waived . . . by failing to raise it."

4   *United States v. Huggins*, 299 F.3d 1039, 1050 n.15 (9th Cir. 2002); *but see United States v.*

5   *Paopao*, 469 F.3d 760, 764 (9th Cir. 2006) (stating government could challenge defendant's

6   standing in defendant's appeal from denial of suppression motion even though government had

7   not raised the issue in the district court).

8        The government has not addressed defendants' standing to raise any of the

9   challenges before the court, and at hearing, defendants said they each had adequately addressed

10  standinng in the respective motions.  As the idea of "standing" is one of substantive Fourth

11  Amendment law, *Ewing*, 638 F.3d at 1230, the court discusses it, if needed, in connection with

12  the challenges to the searches.

13       B.  Warrantless Searches

14       As noted, the defense challenges three warrantless searches:  the seach of Li's car

15  and the two "sniff" searches.  ECF Nos. 79, 94.

16       It is the government's burden to justify a vehicle stop, just as it is its burden to

17  justify warrantless searches.  *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012)

18  (government's burden to show reasonable suspicion for vehicle stop); *United States v.Carbajal*,

19  956 F.2d 924, 930 (9th Cir. 1992) ("The burden is on the Government . . . to show the

20  reasonableness of a warrantless search.  This includes demonstrating that the search comes within

21  one of the narrow exceptions to the warrant requirement.") (internal citations omitted).

22       Although the government acknowledges defendants' challenge to the "sniffs"

23  outside Cliffcrest and McKenna in the introduction to its opposition, it does not engage the issues

24  substantively.  *See* ECF No. 97 at 1.  Moreover, it does not even acknowledge Li's motion to

25  suppress the observations from the vehicle stop, much less provide a copy of any police report

26  prepared as the result of the contact or address the differing descriptions of the search of Li's car.

27  It did address both motions during the hearing on the motion; although this is not the ideal way of

28  meeting the defense challenges, it does preserve the government's position.  *United States v.*

3

1  *Scott*, 705 F.3d 410, 416 (9th Cir. 2012) (finding that government's theory was not forfeited when

2  it was raised during the evidentiary hearing but not included in the government's opposition).

3       The court acknowledges that Li's account of the stop and search is different in

4  some respect than Barnes', but denies Li's request for an evidentiary hearing to resolve the

5  differences, ECF No. 79 at 8, for even assuming Li's rather than Barnes' account is correct, it

6  does not justify suppression. *See United States v. McTiernan*, 695 F.3d 882, 891 (9th Cir. 2012)

7  (recognizing evidentiary hearing was unnecessary when district court assumed defendant's

8  account was correct for purposes of ruling).   Moreover, as there is no suggestion the facts about

9  the sniffs are contested, no evidentiary hearing is required.

10       1. The Vehicle Stop of February 12, 2012

11       The state and federal GPS warrant affidavits and the affidavit for the warrant to

12  search the houses contain the following narrative:  On February 12, 1012, Elk Grove Police

13  Department (EGPD) Officer Barnes stopped a black Lexus, license number 4WYU928, near the

14  residence on Cliffcrest Drive where officers ultimately found marijuana.  Affidavit for State GPS

15  Warrant, ECF No. 78 at 20; Affidavit for Federal GPS Warrant, ECF No. 80-1 ¶ 11; Affidavit for

16  Federal Search Warrant, ECF No. 95-1 ¶ 21.   Officer Barnes identified the occupants of the

17  Lexus as defendants Li and Chen and observed two electric ballasts, warm to the touch, and two

18  high power cultivation light hoods inside the car.  *Id*.  He also detected a strong odor of marijuana

19  inside the car.  *Id.*  The state GPS affidavit and federal search affidavit include additional facts:

20  Li told Barnes that both she and Chen had medical marijuana cards and that they lived in San

21  Francisco and were just visiting the area.  ECF No. 78 at 20.  The state affidavit also reports that

22  Barnes found neither medical marijuana cards nor marijuana in the Lexus.  ECF No. 78 at 20;

23  ECF No. 95-1 ¶ 21.

24       Li has provided a declaration saying the officer told her he stopped her car beause

25  of "too much tint on the windows."  Decl. of Qinghong Li, ECF No. 79 at 9.   In response to the

26  officer's question about marijuana usage, Li said she had a marijuana license; the officer searched

27  her purse and found the license.  *Id.* ¶ 2.  The officer also searched the trunk of the Lexus and

28  found two light hoods and other equipment.  *Id.* ¶ 3.

1    Li's motion does not challenge the initial stop of the car.  ECF No. 79 at 5.

2    Indeed, California courts have found a vehicle stop lawful when the officer's view through a car's

3    side window was obscured by the tint, thus giving rise to reasonable suspicion the car's windows

4    were illegally tinted  in violation of California Vehicle Code § 26708.5(a).  *People v. Roberts*,

5    184 Cal. App. 4th 1169, 1190-91 (2010).

6         Li acknowledges the officer did not need a warrant to search her car's trunk if he

7    had probable cause for the search.  *See California v. Avecedo*, 500 U.S. 565, 580 (1991); *United

8    States v. Phillips*, 2:13-CR-00398-MCE, 2014 WL 1275916 at *3-4 (E.D. Cal. Mar. 27, 2014)

9    ("[I]f police have probable cause to believe that evidence of a crime is somewhere inside a

10   vehicle, they can search anywhere within the vehicle . . . that might contain the object of the

11   search.") (internal citation omitted).  Federal cases have held that "a 'moderate to strong odor' of

12   marijuana coming from the vehicle" gives rise to probable cause to search the vehicle's trunk.

13   *United States v. Zabalza*, 346 F.3d 1255, 1259 (10th Cir. 2003); *see also United States v. Garza*,

14   10 F.3d 1241, 1246 (6th Cir. 1993) (agent's "smelling the marijuana then constituted probable

15   cause to believe there was marijuana in the vehicle); *but see United States v. Downs*, 151 F.3d

16   1301, 1303 (10th Cir. 1998) (establishing distinction between odor of burnt marijuana, which

17   suggests the passengers are using rather than transporting marijuana, and thus does not justify

18   search, and odor of raw marijuana, which suggests transportation and justifies search).

19        However, defendant notes the search was performed by the EGPD, approximately

20   nine months before federal law enforcement officials became involved in the investigation.  Li

21   argues that "[t]he mere fact of the smell of marijuana is not enough for probable cause, because

22   under California law marijuana has lawful medical use which is common."  ECF No. 79 at 2.  She

23   points to California's Medical Marijuana Program Act (MMPA), which exempts certain classes

24   of people from criminal prosecution; any probable cause determination must take the MMPA into

25   account.  *Id.*

26        The government argues that state standards are not applicable and that the officer

27   did not have to eliminate the possibility Li's activities were undertaken legally before concluding

28   he had probable cause to search.  The government cites *United States v. $186,416.00*, 590 F.3d

5

942 (9th Cir. 2009).[1]  That case involved the seizure and ultimate forfeiture of money taken from a medical marijuana cooperative by state authorities, in reliance on a state warrant.  When the money was released to federal authorities for the initiation of forfeiture proceedings, the cooperative challenged the seizure.  The district court suppressed the evidence because the warrant had not complied with Rule 41 of the Federal Rules of Criminal Procedure.  The Ninth Circuit disagreed, noting that Rule 41 did not apply to state searches conducted by state officers.  It also said:  "While there may have been probable cause to search UMCC for a violation of federal law, that was not what the LAPD was doing. . . . Instead, it sought a warrant from a state court judge, though, . . . it lacked probable cause for a state law violation . . . .  [¶]  Accordingly, the search was not illegal because it failed to comply with Rule 41 but because it violated UMCC's Fourth Amendent right[s] . . .in light of the absence of probable cause under state law."  *Id*. at 948; *see also Hawkins v. Mitchell*, 756 F.3d 983, 994 (7th Cir. 2014) ("'The existence of probable cause . . . depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law.'" (quoting *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 715 (7th Cir. 2013)).

Defendant relies on *County of Butte v. Superior Court*, 175 Cal.App. 4th 729 (2009), to argue that the illegality of marijuana under federal law did not prevent the arrest from being illegal under state law.  In *County of Butte*, however, the court did not consider the legality of an arrest, but rather whether the real party in interest could bring a civil suit to challenge an officer's order that he destroy medical marijuana he was growing lawfully; it discusses only obliquely the impact of California's medical marijuana laws on the propriety of searches and so does not provide guidance for the questions before the court.

Under California's Compassionate Use Act (CUA), the criminal laws relating to the possession and cultivation of marijuana do not apply to a patient who possesses or cultivates marijuana for personal medical use, based on the recommendation of a physician.  *Littlefield v. Cnty. of Humboldt*, 218 Cal. App. 4th 243, 250-51 (2013) (citing *People v. Kelly*, 47 Cal. 4th

_____

[1] The government cites to the decision as it appeared at 583 F.3d 1220 (9th Cir. 2009), but that order was amended and superseded on denial of rehearing.

1008, 1012-13 (2010)).  "'[T]he CUA provides an affirmative defense to *prosecution* for the crimes of possession and cultivation.  The CUA does not grant immunity from *arrest* for those crimes, however.  So long as the authorities have probable cause to believe that possession or cultivation has occurred, law enforcement officers may arrest a person for either crime regardless of the arrestee's having a physician's recommendation or approval.'"  *Id.* (quoting *Kelly*, 47 Cal. 4th at 1012-13) (citations omitted; emphases in original).

In 2003, the California Legislature enacted the MMPA "'to faciliate the prompt identification of qualified patients . . . in order to avoid unnecessary arrest and prosecution . . . and provide needed guidance to law enforcement officers."  *Id.* at 250-51.  Under both the CUA and the MMPA, a patient with a recommendation for medical marijuana may possess an amount "reasonably related the patient's current medical needs."  *Id.* at 251 (citing *People v. Trippet*, 56 Cal. App. 4th 1532, 1549 (1997)).  Accordingly, "'[l]aw enforcment officers may arrest a qualified patient for marijuana offenses where they have probable cause, based on all of the surrounding facts including qualified patient status, when they have reason to believe, for instance, that the arrestee does not possess marijuana for his personal medical purposes.'"  *Id.* at 252 (quoting *People v. Strasburg*, 148 Cal. App. 4th  1052, 1058 (2007)); *see also United States v. Phillips*, 9 F. Supp. 3d 1130, 1137 (E.D. Cal. 2014).  ("[W]hen officers become aware that a suspect has a medical marijuana card, the officers must take that information into account when determining whether there is probable cause to conduct a warrantless search . . . ."); *Stewart v. Morris*, Case No. 10-cv-04106 NJV, 2013 WL 5268977, at *8 (N.D. Cal. Sept. 17, 2013) ("[T]he MMPA provides only an affirmative defense to prosecution; it does not create a new standard for probable cause, search or arrest.").

Transportation of marijuana is generally a crime.  However, the MMPA also provides that a qualified patient who "'transports . . . marijuana for his or her own personal medical use'" "'shall not be subject, on that sole basis, to criminal liability'" for transportation.  *People v. Dowl*, 57 Cal. 4th 1079, 1086 (2013) (quoting Health & Saf. Code § 11362.715).  However, even under the CUA and the MMPA, "the Legislature intended to limit the circumstances under which the transportation of medical marijuana is lawful to situations in

1    which the transportation is reasonably related to the patient's medical needs." *People v. Wayman*,

2    189 Cal. App. 4th 215, 223 (2010).  "'The medical marijuana laws were never intended to be 'a

3    sort of "open Sesame" regarding the possession, transportation and sale of marijuana in this

4    state.'"  *Id*. (quoting *Trippet*, 56 Cal. Capp. 4th at 1546; fn. omitted).

5            In this case, when Officer Barnes stopped Li's car, he smelled a strong odor of

6    marijuana.  Li told Barnes she lived in San Francisco and was just visiting the area.  Even

7    assuming Barnes saw Li's medical marijuana card as Li avers, the strong odor of marijuana gave

8    Barnes probable cause to search the car's trunk to determine whether Li in fact possessed the

9    marijuana for personal medical needs, *Strasburg*, 148 Cal. App. 4th at 1060, or the transportation

10   of marijuana was "reasonably related to [her] medical needs."  *Wayman*, 189 Cal. App.4th at 223.

11           Li's motion to suppress observations from the vehicle stop is denied.

12           2.  The "Sniffs" at Cliffcrest Drive and McKenna Drive

13           According to the federal search warrant affidavit, on October 23, 2012, at

14   5:15 a.m., officers "approached the front entry area of the residence" at Cliffcrest and "smell[ed]

15   a strong odor of marijuana coming from the residence and further heard the familiar sounds of a

16   loud humming sound which is consistent with the sound made from the large high power blower

17   fans which are commonly used to circulat[e] the air inside indoor marijuana grows."  ECF

18   No. 95-1 at 15 ¶ 26.  The federal GPS warrant affidavit reports detectives "walked up to the front

19   door and could smell a strong odor of marijuana  . . . as well as hear a loud humming sound . . . ."

20   ECF No. 80-1 at 8.  The state GPS warrant affidavit says that the EGPD detectives "walked up

21   the driveway and on the sidewalk up to the front door which was accessible to the public.  While

22   standing in the front entry area, we could smell a strong odor or marijuana . . . as well as hear a

23   loud humming sound . . . ."  ECF No. 78 at 23.

24           Later, on December 10, 2012, investigators drove to McKenna Drive and "could

25   smell a strong odor of marijuana while in the driveway of the residence.  Investigators could also

26   hear the familiar humming sounds of a high power ventilation system coming from inside the

27   garage as well."  ECF No. 95-1 at 22 ¶ 45.

28   /////

1    Li relies on *Florida v. Jardines*, ___ U.S. ___, 133 S.Ct. 1409 (2013), to argue the

2    officers' sniff violated her rights.  In *Jardines*, police used a drug-sniffing dog to explore outside

3    of Jardines' home and onto the porch.  The dog alerted at the front door,  information that was

4    included in the affidavit supporting the search warrant.  *Id*. at 1413-14.    The Supreme Court

5    held that the dog's intrusion on to the porch was a search within the meaning of the Fourth

6    Amendment.

7    At hearing on the instant motion, the government argued the officers relied in good

8    faith on prior authority that had held the sniffs were not illegal.  *See Davis v. United States*, ___

9    U.S. ___, 131 S. Ct. 2419 (2011) ("Evidence obtained during a search conducted in reasonable

10   reliance on binding precedent is not subject to the exclusionary rule.").  It did not, however,

11   identify any binding precedent upon which the officers could reasonably have relied.

12   In *Jardines*, the Court explained that "[w]hen 'the Government obtains

13   information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the

14   original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  133 S. Ct. at 1414

15   (quoting *United States v. Jones*, __ U.S. __, 132 S. Ct. 945, 950-51 (2012)).  It reviewed the facts

16   of that case:

17   
18   > The officers were gathering information in an area belonging to
     > Jardines and immediately surrounding his house—in the curtilage
     > of the house, which we have held enjoys protection as part of the
     > home itself.  And they gathered that information by physically
19   > entering and occupying the area to engage in conduct not explicitly
     > or implicitly permitted by the homeowner.
20   

21   *Id*.  The Court continued that although there is an implied license for a visitor, including an

22   officer, to approach the home, knock, wait briefly and leave, there is "no customary invitation" to

23   bring a police dog to sniff around the home "in hopes of discovering incriminating evidence."  *Id*.

24   at 1416.  It added that "background social norms that invite a visitor to the front door do not

25   invite him there to conduct a search." *Id*.  *Jardines* thus expanded on the idea explored in *Jones*,

26   that the protections of the Fourth Amendment "do not rise or fall with the *Katz* [reasonable

27   expectation of privacy] formulation," but are also concerned with "government trespass upon the

28   areas" enumerated in the Fourth Amendment.  *Jones*, 132 S. Ct. at 950.  Under this formulation, a

1  "[t]repass alone" does not by itself establish a constitutional violation, but rather "must be

2  conjoined with that what was present here:  an attempt to find something or to obtain

3  information."  *Id*. at 951 n.5.

4         In this case, Li and Chen claim they are entitled to challenge the sniff at Cliffcrest

5  because the GPS information showed Li was an overnight guest at that residence.  ECF No. 94 at

6  2.  Chen does not separately address his expectation of privacy in the houses.  However, *Jardines*

7  is based not on the expectation of privacy, but rather on the common-law protection against

8  trespass.  It is true that an overnight guest may have an expectation of privacy in the place he has

9  spent the night.  *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) ; *but see United States v. Silva*,

10  247 F.3d 1051, 1055 (9th Cir. 2001) (overnight guest had no reasonable expectation of privacy in

11  shed even though he had key and spent night because there was no evidence he was guest of

12  identifiable host or that there was any activity in shed besides drug manufacture).  Even assuming

13  Li has standing, she cites to nothing suggesting an overnight guest may rely on the "common-law

14  trespassory test" expounded on in *Jardines*.  *Jones*, 132 S. Ct. at 952; *see also Johnson v. Cnty. of*

15  *Contra Costa*, NO. C 09-01241 WHA), 2010 WL 3491425, at *15 (N.D. Cal. Sep. 3, 2010) (tort

16  of trespass requires plaintiff to prove ownership or control of property, among other things).

17         Li and Chen spent more time at McKenna:  the GPS showed their cars, the Lexus

18  and the blue Sienna were parked overnight there for several days and both were seen taking

19  children to and from school.  ECF No. 78 at 19-21.  In addition, Chen was the utilities subscriber

20  and the blue Sienna was registered to him at McKenna.  *Id.*  at 19.  But the property was owned

21  by Bai Qiong Li.  *Id*. at 20.  Neither Li nor Chen have presented any evidence showing they

22  controlled, rather than visited the property, or that the officers' conduct in walking up the

23  driveway to sniff and listen violated any implied license they had authority to assert.  Their

24  challenges to the sniffs are denied.

25         C.  Challenges to Search Warrants

26         Defendants argue that the three warrants in this case are not supported by probable

27  cause and that the supporting affidavits suffer from fatal ommissions.  They request an

28  /////

1    evidentiary hearing.  The government counters that the warrants were based on probable cause

2    and there were no material omissions from the affidavits.

3            The warrant clause of the Fourth Amendment requires "probable cause, supported

4    by Oath or affirmation" to justify the issuance of a search warrant. U.S. Const. amend. IV.

5    "Probable cause exists when, considering the totality of the circumstances, the affidavit shows

6    that there is a fair probability that contraband or evidence of a crime will be found in a particular

7    place." *United States v. Fernandez*, 388 F.3d 1199, 1252 (9th Cir. 2004) (quotations omitted).

8    "[O]pinions and conclusions of an experienced agent regarding a set of facts are properly a factor

9    in the probable cause equation under the *Gates* totality of the circumstances approach." *United*

10   *States v. Motz*, 936 F.2d 1021, 1024 (9th Cir. 1991) (internal quotations omitted).   A fair

11   probability does not require "certainty or even a preponderance of the evidence," only "a

12   colorable argument for probable cause. . . ." *United States v. Krupa*, 658 F.3d 1174, 1179-80 (9th

13   Cir. 2011).

14           This court's review of a warrant affidavit is deferential:  "the duty of a reviewing

15   court is simply to ensure that the magistrate [judge] had a 'substantial basis for . . . conclud[ing]

16   that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (alteration in

17   original); *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007).   In reviewing an affidavit,

18   the court must interpret it "in a 'common-sense' fashion, not in a hypertechnical manner; and in a

19   close case, any doubt is to be resolved in favor of upholding the warrant in order to encourage

20   resort to orderly legal processes*." United States v. Coleman*, 423 F. Supp. 630, 633–34 (N.D. Cal.

21   1976) (citing, among other cases, *United States v. Ventresca*, 380 U.S. 102, 108–09 (1964);

22   *United* States v. Wong, 470 F.2d 129 (9th Cir. 1972)).

23           A challenge to an affidavit supporting a search warrant must generally be based on

24   the face of the affidavit.  However, in *Franks v. Delaware*, the United Sates Supreme Court held

25   that a defendant is entitled to a hearing to challenge an affidavit when she satisfies a two-part test:

26   First, she must make a substantial preliminary showing that the affidavit includes false statements

27   included deliberately or as the result of a reckless disregard for the truth.  438 U.S. 154, 171

28   (1978).   This showing must be accompanied by an offer of proof.  *Id.*.  Deliberate or reckless

1   omissions of facts that tend to mislead may also trigger a *Franks* hearing.  *United States v*

2   *Jawara*, 474 F.3d 565, 582 (9th Cir. 2007).  Second, "the court must determine that the

3   challenged statement is necessary to a finding of probable cause, i.e., that its excision would leave

4   the affidavit with insufficient content to establish probable cause."  *United States v. Chesher*,

5   678 F.2d 1353, 1360 (9th Cir. 1982) (citing  *Franks*, 438 U.S. at 171-72).

6          When the results of a warrant-based search are challenged in a motion to suppress,

7   the defendant bears the burden of demonstrating the search was unreasonable under the Fourth

8   Amendment.  *See United States v. Ankeny*, 502 F.3d 829, 836 (9th Cir. 2007).

9          1.  The State GPS Warrant

10                 a.  The Affidavits

11          In April 2012, Sacramento Municipal Utility District (SMUD) employee Rod

12   Fetch reported high power usage at 86** Everidge Court, Sacramento (Everidge) to EGPD

13   Detective Roy Keller.  ECF No. 78 at 15.  The average monthly power usage was 9,936 kilowatt

14   hours (KWH), which Fetch said was consistent with marijuana production.  *Id.*  Fetch advised

15   Detective Keller the utilities subscriber for Everidge was Limei Feng.  *Id*. at 15.   Detective Keller

16   learned Zhiqiang Liu listed Everidge as his place of residence.  *Id.*  However, Liu's registered

17   DMV address was Wisconsin Street, San Francisco.  The owner of Everidge was Green Venture

18   LLC, with the same San Francisco address as Liu.  *Id.* at 17.

19          On April 5, 2012, Detective Keller drove to Everidge and observed the windows

20   were covered by blinds, two windows were partially open, and the screens were dirty with debris.

21   *Id.* at 15.  In Keller's experience, the appearance was consistent with a marijuana grow house:

22   windows are left open for ventilation and the suction from the fans leaves a debris build-up on the

23   screen.  *Id*.

24          On April 12, 2012, Detective Keller and his coworkers noted the windows at

25   Everidge were still open despite rain.  *Id*. at 16.  The detectives approached the home and could

26   hear a humming sound coming from inside the residence which, in their experienced opinions,

27   was consistent with the sound made by ventilation systems used in marijuana grow operations.

28   *Id.*

12

1    On April 18, 2012, Detective Keller observed Liu leave the Everidge garage in a

2 silver Toyota Sienna license 6UN**** (silver Sienna).  *Id.*  EGPD detectives learned Limei Feng

3 was the registered owner of the silver Sienna at an address on Wisconsin Street, San Francisco.

4 *Id.* at 15.

5    EGPD detectives followed Liu to 82** Cliffcrest Way, Sacramento (Cliffcrest),

6 where he pulled into the garage.  *Id.* at 16.  The blinds at Cliffcrest were tightly drawn and in

7 Keller's experience, marijuana cultivators keep windows covered tightly.  *Id.*  Fetch informed

8 Detective Keller the utilities subscriber for Cliffcrest was Shicai Wu and the power usage for the

9 home had been over 10,000 KWH for the preceding two months.  *Id.*  Detectives later learned that

10 Zhicai Wu owned Cliffcrest, though he had a mailing address on Pacific Avenue, San Francisco,

11 California.  *Id.* at 16–17.

12    While observing Cliffcrest, EGPD detectives saw Qinghong Li arrive in a black

13 Lexus license 4WY**** (Lexus) and walk towards the house.  *Id.* at 16.  The Lexus was

14 registered to Li at an address on Jackson Street, San Francisco, while her address with the DMV

15 was on Pacific.  *Id.* at 16-17.

16    Shortly after Li's arrival, Liu left Cliffcrest in the silver Sienna and returned to

17 Everidge.  *Id.* at 16.

18    On July 7, 2012, Detective Keller found a bag filled with marijuana plant leaves

19 and stems in the trash container on the curb in front of Everidge.  *Id.* at 17.

20    On September 11, 2012, Detective Keller and another EGPD detective drove to

21 Everidge and could hear whistling, consistent with the sound made by ventilation systems used in

22 marijuana grow operations, coming from the open front door of the house.  *Id.* at 17–18.

23    On September 12, 2012, Detective Keller learned Everidge had used 10,253 KWH

24 of power the previous month, and Cliffcrest had used 10,088 KWH.  *Id.* at 18. Detective Keller

25 conducted surveillance at Everidge and saw the silver Sienna arrive and park in the garage.  *Id.*

26 Sheetrock and interior doors were stacked inside the garage; in Detective Keller's experience,

27 bedroom doors are removed from grow-rooms and sheetrock is used to enclose large open areas.

28 *Id.*

1          On September 18, 2012, Detective Keller observed a blue Toyota Sienna license

2 6LH**** (blue Sienna) pull into the garage of Cliffcrest. *Id.* at 19.  Shortly thereafter, Detective

3 Keller observed defendant Shihong Chen drive the blue Sienna from Cliffcrest to 3* Caina Court,

4 Sacramento, California (Caina) where he picked up Li. *Id.*  Chen then drove with Li to 97**

5 McKenna Drive (McKenna) and parked in the garage. *Id.*  EGPD detectives observed Chen leave

6 McKenna and take two children to a nearby elementary school. *Id.*  Later Chen picked up two

7 minors from a nearby high school and returned with them to McKenna.  The black Lexus was

8 parked in the garage. *Id.*

9          Fetch informed Detective Keller that Chen was the utilities subscriber for

10 McKenna. *Id.*  The house used just below 5,000 KWH of power the previous month, which was

11 abnormally high. *Id.* at 19–20.  Detective Keller found McKenna was owned by Bai Qiong Li,

12 who had a DMV-registered address that matched Zhicai Wu's on Pacific Avenue, San Francisco.

13 *Id.* at 20; ECF No. 95-1 ¶ 20.  The blue Sienna was registered to Chen at McKenna's address,

14 though his DMV-listed address was the same as Li's, Jackson Street, San Francisco, California.

15 ECF No. 78 at 19.

16          On September 19, 2012, Detective Keller and another EGPD detective observed

17 the Lexus parked in front of Cliffcrest. *Id.* at 20.  On September 25, 2012, Detective Keller

18 learned about Officer Barnes' February 21, 2012 traffic stop of Li and Chen in the black Lexus

19 near Cliffcrest, the odor of marijuana in their car, Li's claim that she and Chen had medical

20 marijuana cards, and Barnes' discovery of the electric ballasts and two grow lamps in the car. *Id.*

21 The affidavit reported that Barnes did not find medical marijuana cards or marijuana in the Lexus.

22 ECF No. 78 at 20.

23          On September 25, Keller saw Li leave McKenna in the Lexus, drop a minor off at

24 a nearby high school, and return to the house. *Id.*  Upon her return, a Toyota Rav4, license

25 4YX**** and registered to Peng at an address on Pacific Avenue, San Francisco, was parked out

26 front. *Id.* at 20–22

27          Later in the evening on the 25th, EGPD detectives followed Chen in the blue

28 Sienna from  Cliffcrest to McKenna. *Id.* at 21.  At McKenna, Li, Bao Qiong Li, Peng, and an

1   unknown adult and unknown children entered the van.  *Id.*  Chen drove the group to a restaurant.

2   *Id.*

3           As Chen left McKenna, other detectives followed Liu as he left Everidge in the

4   silver Sienna.  *Id.*  Liu made several quick lane changes on the freeway, left the freeway abruptly,

5   and made a quick U-turn, suggestive of the kind of counter-surveillance he had seen used by drug

6   dealers.  *Id.*

7           Officers eventually found Liu again and followed him to the same restaurant

8   where Chen and the others had gone.  *Id.* at 22.  Liu and Li left the restaurant in the silver Sienna

9   and drove to a vacant house on Belleau Wood Lane; the two walked around outside the house and

10  then returned to the restaurant.  *Id.*  In Keller's opinion, the two were inspecting the house for

11  possible purchase.  *Id.*

12          On September 29, 2012, Detective Keller received power usage comparisons for

13  Everidge, Cliffcrest, and McKenna.  *Id.*  Everidge's power usage averaged 9,075 KWH per

14  month, while neighboring residences showed average monthly power usage rates of 1,347 KWH,

15  574 KWH, and 743 KWH.  *Id.*  Cliffcrest's power usage averaged 8,581 KWH per month, while

16  neighboring residences averaged at 853 KWH, 509 KWH, and 503 KWH per month.  *Id.*

17  McKenna's power usage averaged 2,852 KWH per month, while neighboring residences

18  averaged at 764 KWH, 447 KWH, and 866 KWH per month.  *Id.*  In Detective Keller's

19  experience, indoor marijuana growing operations use many grow lamps, ballasts and fans, all of

20  which use large amounts of electricity compared to neighboring houses.  *Id.*

21          On October 9, 2012, Detective Keller found  two small marijuana leaves in the

22  Cliffcrest trash container.  *Id.*  During the month of October, Detective Keller periodically

23  surveyed Everidge and Cliffcrest and observed that they maintained the outward appearance of

24  marijuana grow houses, with blinds tightly closed and a few windows open, their screens covered

25  with debris.  *Id.* at 23.  Also in October, officers noticed the windows of a "bonus room" above

26  the garage at McKenna were tightly covered so that light could not enter or leave the room,

27  consistent with marijuana growing.  *Id.*

28  /////

1          As noted above, on October 23, 2012, Detectives Keller and Ramos walked up to

2   Cliffcrest's front door and while standing in the front entry area, they smelled a strong odor of

3   marijuana and heard a humming sound consistent with the sound made by ventilation systems

4   used for marijuana grow operations.  *Id*.  The detectives drove to Everidge and, upon walking to

5   that house's front door, were able to hear a similar humming sound.  *Id*.  The windows of

6   Everidge were also open despite the fact it had rained the night before.  *Id*.

7          On October 25, 2012, Detective Keller learned the average monthly power usage

8   rate for Caina was 4,979 KWH per month, up from 909 KWH the previous month.  *Id*.  Detective

9   Keller drove to Caina and observed its window blinds were tightly closed and a small upstairs

10  bathroom window was open.  ECF No. 78 at 23.

11         Based on these observations, Detective Keller sought a warrant to allow the

12  installation of GPS tracking devices on Li's Lexus and Chen's blue Sienna.  *Id*. at 24, 27.  He

13  believed Li was driving the Lexus "to actively sell and distribute marijuana throughout

14  Sacramento" and wanted to "locate the places where the vehicles pick up and/or deliver

15  marijuana, proceeds from the sales of marijuana and/or items associated with the sales of

16  marijuana."  *Id*.

17         A state judge issued the warrant as requested on October 25, 2012, authorizing

18  GPS tracking for ten days.  On November 6, 2012, the judge renewed the warrant.  The affidavit

19  supporting the renewal reported the tracker had revealed the Lexus had been parked at Gwerder

20  Court (Gwerder).  *Id*. at 65.  Detectives saw Jun Peng driving a Toyota Rav4, which officers had

21  seen at McKenna several times, pull into the Gwerder driveway and begin unloading lumber,

22  which Keller averred is often used to build frames for grow trays and false walls, and ducting,

23  which is used for blower fans to ventilate grow rooms.  *Id*. at 66.  Property records showed Peng

24  and Liandi Wu owned Gwerder.  *Id*.  The energy consumption for Gwerder in October was 21

25  KW, with service beginning on October 1.  *Id*.

26         Officers saw Chen arrive at Gwerder in his blue Sienna and then followed Chen

27  and Peng to a Home Depot, where they purchased plywood and 2x4's and returned with the

28  materials to Gwerder.  *Id*. at 67.

1    The GPS tracker showed the Lexus had again visited Belleau Wood, which Li

2    and Liu had visited on September 25.  *Id*.

3                    b.  The Motion to Suppress

4                    i.  Probable Cause

5    Li and Chen argue the state GPS warrant is not supported by probable cause

6    because the only information linking the Lexus to marijuana growing is the fact it had parked for

7    two hours at a possible grow house once in a five month period, while the evidence linking the

8    blue Sienna to criminal activity was a mere two visits to a possible grow house.   ECF No. 71 at

9    7.  They argue neither presence is sufficient to establish probable cause for tracking the van and

10   the car to develop evidence of marijuana sales and distribution.  *Id*. at 9-10; ECF No. 98 at 1-2.

11   They also argue there was no probable cause under state law because Detective Keller made no

12   attempt to determine whether any marijuana growing operation at Cliffcrest was legal, in light of

13   Chen's and Li's medical marijuana cards.  ECF No. 71 at 8-9.

14   The government counters that the affidavit adequately described the "basis of the

15   investigation, the multiple sources of information indicating the participants and the scope of the

16   marijuana cultivation conspiracy."  ECF No. 97 at 13.

17   As noted above, under California law, medical marijuana patients, whether or not

18   they have a card, are "not protected for [t]he acts of selling, giving away, transporting, and

19   growing large quantities of marijuana, [which] remain criminal.'"  *Chavez v. Superior Court*,

20   123 Cal. App. 4th 104, 110 (2004) (citation omitted).

21   Here, the affidavit sufficiently describes the apparent use of Everidge, Cliffcrest,

22   and McKenna for commercial-style production of marijuana:  Everidge, Cliffcrest, McKenna, as

23   well as Caina, had patterns of excessive consumption of electricity compared to the neighboring

24   houses, with usage at McKenna and Caina jumping dramatically during the surveillance period;

25   officers found marijuana in the trash at both Everidge and Cliffcrest; officers heard the humming

26   sound of ventilation fans used in large marijuana-grow operations coming from Everidge and

27   Cliffcrest and smelled marijuana at Cliffcrest; Everidge, Cliffcrest and Caina appeared to be grow

28   houses, with blinds tightly drawn, but a window or two left open for ventilation even during the

17

1  rain, and debris on some of the screens; in October, officers noticed windows of a room above the

2  garage at McKenna were tightly covered; Chen and Peng purchased materials that could be used

3  to convert Gwerder into a grow house; doors and sheetrock were seen in public view in

4  Everidge's garage, suggesting rooms had been configured for marijuana production; Li and Chen

5  had been carrying electric ballasts still warm to the touch and light hoods when Officer Barnes

6  stopped their car, smelling strongly of marijuana, near Cliffcrest, yet they claimed they were

7  merely visiting from San Francisco; Li and Liu visited a house for sale after Liu had been driving

8  in a manner suggestive of counter surveillance; Chen's blue Sienna had visited Cliffcrest on three

9  occasions and McKenna on five occasions, and he had picked up Li once from Caina; Li had

10  visited McKenna twice, Cliffcrest once and Caina once.

11  The affidavit thus describes Li's and Chen's activities consistent with involvement

12  in a marijuana growing operation involving at least two established, clandestine growing sites -

13  Everidge and Cliffcrest, expanding to a third, and possibly fourth site - Caina and McKenna,

14  respectively.  In light of the information suggesting that Li and Chen actually lived in San

15  Francisco, the reviewing magistrate could have reasonably deduced that the Sacramento and Elk

16  Grove locations were not operated to provide medical marijuana for Li and Chen alone, but rather

17  as a business.  *Cf. United States v. Smith*, No. 2:11-cr-00428 GEB, 2012 WL 2620526, at *3

18  (E.D. Cal. July 5, 2012).

19  Chen notes the warrant was authorized to gather evidence about the distribution of

20  marijuana, yet nothing in the affidavit points to any distribution or sales activity.  ECF No. 98 at

21  1-2.  The issuing magistrate, however, taking a common sense view of the affidavit, could have

22  concluded that the purpose of a clandestine marijuana growing operation, using several locations

23  for production of marijuana, was the ultimate distribution of a large amount of the product.

24  The totality of the circumstances described in the affidavit allowed the magistrate

25  to reasonably conclude there was a fair probability evidence of marijuana distribution might be

26  found by tracking the Lexus and the blue Sienna.

27  /////

28  /////

ii. *Franks* Hearing

Li argues the affidavit provided electrical consumption figures for Everidge, Cliffcrest, McKenna and Caina without including the square footage of these houses along with the square footage of the neighboring homes used for the comparison electrical figures. ECF No. 71 at 11. She argues that in this way, "by reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." *Id.* She seeks a *Franks* hearing to explore whether the omission of this information constitutes omission of a material fact.

As noted, a defendant seeking a hearing must make an offer of proof, a substantial preliminary showing that material information was omitted. Li has not provided information about the sizes of the houses on Everidge, Cliffcrest, McKenna, and Caina, all of which she had access to. She has not even attempted to meet the first prong of the *Franks* showing. Li is not entitled to a *Franks* hearing.

Chen argues he also is entitled to a *Franks* hearing because Keller deliberately omitted the fact that Barnes had seen at least Li's medical marijuana card during the search of the Lexus. However, as discussed above, even if the issuing magistrate had been informed Barnes had found Li's medical marijuana card, this information would not have changed the probable cause calculus: the affidavit described a large-scale marijuana growing operation, outside the protections of the CUA and MMPA. Chen is not entitled to a *Franks* hearing.

2. The Federal GPS Warrant

a. The Affidavit

The federal GPS warrant affidavit repeats much of the information developed by EGPD, stated in slightly different terms, and incorporates information secured through EGPD's monitoring of the GPS units attached to the Lexus and the blue Sienna as well as further surveillance.

The GPS tracker for the Lexus was installed on October 26, 2012, while it was at McKenna, and after several days of observation, EGPD detectives learned the vehicle had been parked in front of a residence at 81** Gwerder Court ("Gwerder"). ECF Nos. 80-1 at ¶¶ 17-18. EGPD detectives went to Gwerder and observed the Lexus parked outside. *Id.* Shortly thereafter,

19

1   Peng and Chen, driving the Toyota Rav4 previously observed at McKenna, pulled into the

2   Gwerder's driveway ECF No. 80-1 ¶ 19.  The men unloaded lumber and large ducting into the

3   garage.  *Id.*  The affiant, Special Agent Swenson, said that based on his experience, marijuana

4   cultivators will use lumber to frame supports for grow trays and the ducting as part of the

5   ventilation system.  ECF No. 80-1 ¶ 19.  *Id.*

6              On November 2, 2012, EGPD detectives observed Chen drive from McKenna to

7   Gwerder in the blue Sienna.  ECF Nos. 80-1 at ¶ 20.  While Chen was inside the house, detectives

8   installed the GPS tracker onto the blue Sienna.  ECF No. 80-1 ¶ 20.  Chen and Peng left Gwerder

9   in the blue Sienna, went to Home Depot, purchased lumber, returned to Gwerder and unloaded

10  the lumber into the house.   ECF No. 80-1 ¶ 20.

11             Between November 2 and November 4, 2012, EGPD detectives monitored the

12  GPS trackers and observed the Lexus and blue Sienna "frequenting" Cliffcrest and McKenna.

13  ECF No. 80-1 ¶ 21.  The state GPS warrant expired on November 4, but was renewed on

14  November 6, 2012 by Judge Sapunor of the Sacramento County Superior Court.  ECF No. 80-1

15  ¶ 23.  On November 6,  the blue Sienna's GPS tracker indicated the van was in a warehouse

16  district in Sacramento.  ECF No. 80-1 ¶ 23.  By the time investigators reached the area, the van

17  was gone, but one business in the area was "Hydro World," a hydroponics business.  ECF No.

18  80-1 ¶ 23.  Swenson observed that in his experience, marijuana growers often purchase

19  hydroponics equipment, such as ballasts, light hoods, fans and carbon filters.  ECF No. 80-1 ¶ 23.

20             Investigators tracked Chen and Peng to Cliffcrest and from there to McKenna.

21  ECF No. 80-1 ¶ 23.

22             On November 16, 2012, Swenson applied for a warrant to install GPS tracking

23  units on the Lexus and the silver and blue Siennas, opining the vehicles "will be used to facilitate

24  the transportation and distribution of marijuana" and that tracking the vehicles would allow

25  agents to identify others involved in the marijuana cultivation operation.  ECF No. 80-1 ¶¶ 25, 26.

26  A federal magistrate judge signed the warrant on November 16, 2012.  ECF No. 80-1 at 14.

27  /////

28  /////

20

1    b.  Li's Motion to Suppress

2    i.  Probable Cause

3    Li again argues the warrant is not supported by probable cause because it shows

4    only that the Lexus and the blue Sienna visited Cliffcrest, a possible grow house on a few

5    occasions, and that the figures about electricity use at McKenna by themselves do not establish

6    probable cause or, at most, show that one room was being used by medical marijuana patients

7    growing their own supply.   ECF No. 80 at 6, 8.

8    As noted in connection with the state GPS warrant, the affidavit shows more than a

9    few visits to a grow house.  Instead, it suggest Li and Chen were part of a group involved in

10   growing marijuana at several houses outfitted for large-scale cultivation.

11   It is true McKenna did not have the same signs it was being used as a grow house,

12   but the affidavit did include information that its consumption of electricity was high compared to

13   its neighboring houses.   Relying on *United States v. Clark*, Li argues this is insufficient.  31 F.3d

14   831 (9th Cir. 1994).  In *Clark*, however, the Ninth Circuit found an affidavit wanting when it said

15   only that the electrical consumption was unusually high without providing any information about

16   the average residential electrical consumption of houses generally in rural Alaska.  *Id*. at 835.

17   The affidavit in this case does not simply say McKenna's electricity consumption was high, but

18   provides comparisons with three neighboring house supporting the conclusion. ECF No. 80-1 ¶

19   13.  Li's attack on this portion of the affidavit is not availing.

20   ii.  *Franks* Hearing

21   As she did in connection with the state GPS warrant, Li argues the federal affidavit

22   omitted information about the houses used for comparison of electrical usage.   In this motion,

23   she chides the affiants for not consulting Zillow for information about the square footage of

24   neighboring houses.  As before, however, it is Li's burden; she too could have found information

25   on Zillow and presented it had she believed it was exculpatory.  ECF No. 80 at 9.

26   Li also argues this affidavit omits evidence that Cliffcrest was owned by Zhicai

27   Wu, who had listed the same address in San Francisco as Li did.  She argues this is exculpatory

28   /////

1    because it suggests a familial relationship rather than a drug distribution connection.  *Id*.  Even if

2    there was a familial connection, it does not rule out a drug connection as well.

3             Li argues the federal affidavit excluded information suggesting that Chen probably

4    lived at McKenna with several children.  ECF No. 80 at 9-10.   She notes the state GPS affidavit

5    describes officers' observations of Chen travelling to and from schools with several children.  *See*

6    ECF No. 78-1 at 19, 20.   She also presents the declaration of Juan Doig, an investigator with the

7    Federal Public Defender's Office, who analyzed the state GPS data.  Doig reports that during the

8    time the state tracker was in operation, the blue Sienna did not visit schools, but the Lexus went

9    to Laguna Creek High School on five occasions and to Arlene Elementary School twice.  Decl. of

10   Juan Doig,  ECF No. 88 ¶¶ 10, 13.  Li argues this pattern of visits is relevant because it shows she

11   and Chen did not visit McKenna solely in connection with illegal activity.   However, even if this

12   information is included in the warrant, it does not undercut probable cause:  the description of

13   Li's and Chen's involvement not only with McKenna, but also their connections to Cliffcrest,

14   Caina and Gwerder, as well as their connection with Liu adequately support a finding of probable

15   cause.  That they may have taken children, their own or a relative's, to school does not absolve

16   them of their involvement with Liu, their visits to Cliffcrest and Caina, and the high energy usage

17   at McKenna.

18            Li notes Special Agent Swenson's affidavit erroneously states the period of

19   authorization granted for the state GPS warrant.  *See* ECF No. 80-1 ¶ 21 (stating EGPD detectives

20   monitored the Lexus and blue Sienna from September 26, 2012 to November 4, 2012).  Li argues

21   this error was made recklessly, and that it in conjunction with the affidavits use of "frequenting,"

22   "grossly exaggerated the number of visits to [Cliffcrest]" the blue Sienna and Lexus made.  ECF

23   No. 80 at 10.

24            Though the affidavit is certainly incorrect in stating that EGPD detectives

25   monitored the movements of the vehicles through the GPS beginning on September 26, 2012,

26   rather than on October 25, 2012, Li has not demonstrated this error rises to the level of a false

27   statement made intentionally or with reckless disregard for the truth.  Special Agent Swenson's

28   affidavit provides a chronological overview of the investigation undertaken by the EGPD and

22

1   DEA.  As such, the affidavit makes it clear in context, in the paragraphs immediately preceding

2   the erroneous date, that EGPD officials did not monitor the cars beginning on September 26,

3   2012.  *See* ECF No. 80-1 ¶¶ 17–20 (California GPS warrant authorized on October 25, 2012, and

4   EGPD detectives installed Lexus tracker on October 26, 2012 and the blue Sienna's on

5   November 2, 2012).  Given the clarity on the investigation's sequence of events the affidavit

6   otherwise supplies, Li has shown only that the use of the erroneous date might be negligent, but

7   not an intentional or reckless false statement.

8           Finally Li argues Agent Swenson recklessly said that the Lexus and the blue

9   Sienna "frequented" Cliffcrest during the time the state GPS trackers were in place, given the

10  brief time the vehicles were monitored.   Doig avers that during the time of the state monitoring,

11  the Lexus visited Cliffcrest four times, but the Sienna did not.  While the use of "frequenting" is

12  an unfortunate overstatement, neither it nor the addition of  information about the actual number

13  of visits changes the ultimate finding of probable cause, based as it is on the observed visits as

14  well as the nature of the places visited.  Li has not met her burden and a *Franks* hearing is not

15  required.

16                          c.  Liu's Motion to Suppress

17          Liu argues the federal affidavit did not establish probable cause to believe tracking

18  his car would lead to evidence of drug distribution.  First, he notes the legality of medical

19  marijuana in California, but this leads nowhere as growing and possessing marijuana is not legal

20  under federal law.  *Gonzales v. Raich*, 545 U.S. 1 (2005).  Even if state law controlled, Liu has

21  pointed to nothing suggesting he was a medical marijuana patient at the relevant time.   ECF

22  No. 82 at 4, 6.

23          Next, he echoes Li that high electricity consumption does not establish probable

24  cause.  As noted, however, the affidavit provides comparisons with neighboring houses.  ECF No.

25  80-1 ¶ 13.  Liu also argues the affidavit does not include information about the size and location

26  of the houses used for comparison, but as the affidavit described them as neighboring; in light of

27  the homogeneous nature of most American neighborhoods, the magistrate judge could reasonably

28  /////

1    have inferred the houses used for comparison were sufficiently similar to make the comparison

2    meaningful.

3              Additionally, Liu argues that officers neither saw a single plant nor inspected Liu's

4    bank records for information about unusual transactions.  ECF No. 82 at 6.  However, Keller and

5    Swenson both said Everidge appeared to be a marijuana grow house, based on the tightly closed

6    blinds, the window that remained opened despite the weather, the debris on the screen, the sound

7    of humming or whistling consistent with ventilation, and the marijuana leaves and stems in the

8    trash.  ECF No. 80-1 ¶¶ 2, 4, 7.  Moreover, as noted above, officers observed Liu engage in

9    countersurveillance as he left Everidge to meet Li before examining another house.  ECF No. 80-

10   1.  Liu has cited no authority providing that probable cause depends on observations of actual

11   growing plants or evidence of drug profits.   Considering the totality of the circumstances, the

12   issuing magistrate judge could have concluded there was a fair probability evidence would be

13   disclosed by tracking Liu's car.

14              3.  The Federal Search Warrants

15                 a.  The Affidavit

16              Once again, the federal search warrant affidavit incorporated much of the

17   information from the state and federal GPS warrant applications.  It includes the following

18   additional  information:

19              On November 6, 2012, agents tracked the blue Sienna from the area around Hydro

20   World to an address on 45th Avenue (45th) and saw Chen and Peng leave the van.  ECF No. 95-1

21   ¶ 35.  Also on that day, investigators observed a Mercury Mystique registered to an individual

22   named Toan Gia Van of Vallejo, California, outside Caina.  Id.

23              On November 7, 2012, investigators learned that the property owner and utilities

24   subscriber for 45th was Xiu Zhen Chen.  *Id.* ¶ 36.  Investigators also learned Toan Gia Van was

25   the utilities subscriber for a house at 69** Pradera Mesa Drive ("Pradera Mesa"), which had a

26   "very high" monthly power usage rate of 3,160 KWH.  *Id.*

27              Investigators surveyed Pradera Mesa and saw the Mystique pull into the house's

28   garage of that house.  *Id.* ¶ 37.

1    On November 15, 2012, investigators observed Van and a passenger leave Pradera

2 Mesa in a Nissan van registered to Toan Gia Van.  *Id.* ¶ 38.  The two drove to Caina and stayed in

3 the house for fifteen minutes, and then drove to HydroWorld, where they bought some things and

4 returned with their purchases to Caina.  *Id.*  Van then returned to Pradera Mesa.  *Id.*

5    Additionally, investigators observed Chen and Li arrive at 45th in the blue Sienna,

6 where they met with Xiu Chen and others.  *Id.* ¶ 39.  When Chen and Li left 45th, they went to

7 the house on Belleau Wood that Li and Liu had inspected on September 25, 2012.  *Id.*  After

8 speaking with an Asian male there, the two drove to Cliffcrest and parked in the garage.  *Id.*

9 When Li and Chen left Cliffcrest they went to McKenna just about the time Peng and Liandi Wu

10 arrived in the Rav4.  Everybody went inside.  *Id.*

11    On November 16, 2012, Liu left Everidge in the silver Sienna and drove to

12 Sacramento 420, a medical marijuana business.  *Id.*  ¶ 40.  Liu entered the business, but left

13 shortly thereafter.  *Id.*

14    On December 4, 2012, investigators drove by Caina and found approximately 166

15 marijuana root balls and some loose marijuana leaves in a bag in its trash container at the curb.

16 *Id.* ¶ 41.

17    On December 5, 2012, federal investigators installed a GPS tracking device on the

18 silver Sienna after the magistrate judge signed the GPS warrant, as recounted above. *Id.* ¶ 43.

19    On December 10, 2012, investigators walked up McKenna's driveway and could

20 smell a strong odor of marijuana and hear a humming sound consistent with the noise produced

21 by ventilation systems used for marijuana grow operations.  *Id.* ¶ 45.

22    On December 15, 2012, Ling Feng left Pradera Mesa in the Nissan van and drove

23 to Caina, where she stayed for about an hour.  *Id.* ¶ 47.

24    On January 8, 2013, investigators found large amounts of wet marijuana leaves in

25 the trash containers from Caina and Pradera Mesa.  *Id.* ¶ 48.

26    On January 8, 2013, investigators heard the humming sound consistent with

27 ventilation systems from both Everidge and Cliffcrest and noticed that both houses had small

28 video surveillance cameras affixed to them.  *Id.* ¶ 49.

1          On January 16, 2013, investigators received the following information about

2  power consumption from SMUD:  Everidge's power usage averaged 10,758 KWH per month,

3  and the home had a last month power usage of 13,219 KWH.  *Id.* ¶ 51.  Three neighboring

4  residences showed monthly average power usages of 617 KWH, 555 KWH, 756 KWH.  *Id.*

5  Cliffcrest's power usage averaged 10,348 KWH per month and the house had used 11,855 KWH

6  the previous month.  *Id.* ¶ 52.  Three neighboring residences showed monthly average power

7  usages of 842 KWH, 532 KWH, and 511 KWH.  *Id.*  McKenna's power usage averaged 4,541

8  KWH per month and the house had used 6,528 KWH the previous month.  *Id.* ¶ 53.  Three

9  neighboring residences showed monthly average power usages of 739 KWH, 460 KWH, and 840

10  KWH.  *Id.*  Gwerder's power usage averaged 2,965 KWH per month and the house had used

11  5,827 KWH the previous month.  *Id.* ¶ 54.  Three neighboring residences showed monthly

12  average power usages of 444 KWH, 834 KWH, and 464 KWH.  *Id.*  The power usage at 45th

13  averaged 5,596 KWH per month and was 6,842 KWH the previous month; three neighboring

14  houses had monthly averages of 733  KWH, 1,060 KWH and 26 KWH.  *Id.* ¶ 55.  The power

15  usage for Pradera Mesa averaged 3,654 KWH per month, with 4,664 KWH used the previous

16  month, while three neighboring residences had monthly power usages of 948 KWH, 1,087 KWH

17  and 795 KWH a month.  *Id.* ¶ 56.  Caina's power usage averaged 7,154 KWH per month and the

18  house had used 9,968 KWH the previous month.  *Id.* ¶ 57.  Three neighboring residences showed

19  monthly average power usages of 948 KWH, 1,087 KWH, and 795 KWH per month.  *Id.*

20          Based on these observations, Special Agent Swenson prepared the federal search

21  warrant application for a search of Everidge, Cliffcrest, McKenna, Gwerder, 45th, and Pradera

22  Mesa which was approved by a different federal magistrate judge on January 29, 2013.  ECF No.

23  95-1.

24          On January 30, 2012, investigators executed the federal search warrants.  ECF

25  No. 1 ¶ 4.  At Everidge, investigators found a marijuana grow which "encompass[ed] the majority

26  of the residence" and seized 867 marijuana plants and approximately 50 pounds of processed

27  marijuana."  *Id.* ¶ 12.  At Cliffcrest law enforcement found a marijuana grow "encompassing four

28  rooms in the residence," and seized 417 marijuana plants and two pounds of marijuana.  *Id.* ¶ 13.

1   Investigators found a marijuana grow in McKenna's garage and seized 152 growing marijuana

2   plants and 390 marijuana clone plants, among other thing.  *Id*. ¶ 14.  At Caina officers found a

3   grow that took up "the entire residence" and seized 600 marijuana plants and a half-pound of

4   processed marijuana, among other things.  *Id*. ¶ 15.  Investigators found another grow operation at

5   Gwerder and seized 251 marijuana plants.  *Id*. ¶ 16.  The search of 45th also uncovered a grow

6   operation and law enforcement secured  282 marijuana plants "growing inside the various rooms

7   of the house," as well as fifteen pounds of processed marijuana and other items connected to the

8   grow.  *Id*. ¶ 17.  At Pradera Mesa, investigators discovered a marijuana grow and seized 343

9   marijuana plants and approximately ten pounds of processed marijuana.  *Id*. ¶ 18.

10                                          b.  Li's Motion to Suppress

11                                           i.  Probable Cause

12                  The affidavit says that agents believe McKenna "likely contains a marijuana grow"

13   based on the smell of marijuana, the sound of the fan, the high electrical consumption, and the

14   visits by Li, Chen and Peng.   ECF No. 95-1 ¶ 61.

15                  Li argues there is no probable cause for McKenna because the warrant does not

16   clearly tie any of her contacts with other potential marijuana grows to the McKenna address.  She

17   suggests the affidavit shows she and Chen lived at McKenna with several children and only

18   visited Cliffcrest, where the power consumption suggested a marijuana growing operation.  She

19   says the fact that she had growing equipment in her car in February 2012 does not add to the

20   probable cause because Chen was not the power subscriber at McKenna until four months later.

21   She argues her one contact with Liu shows nothing about growing marijuana at McKenna.

22   Finally she argues that the odor of marijuana in December 2012 does not suggest marijuana

23   would still be present in January 2013, particularly in light of her status as a medical marijuana

24   user. [2]

25   /////

26   _____

27          [2] She argues that "evidence that a medical marijuana user smoked marijuana on the
     property once 50 days before the search is so distant that it is irrelevant to probable cause."  ECF
     No. 95 at 5.  She presents no evidence, however, that she had been smoking marijuana at
28   McKenna.

1         The government counters that the warrant authorized not only a search for growing

2   marijuana, but also for currency, "narcotics or money ledgers, narcotics distribution or customer

3   lists, . . . pay and owe sheets, records and other documents noting the price, quantity, date and/or

4   times when narcotics were purchased"; "items evidencing the obtaining, transfer, and/or

5   concealment of assets"; "items reflecting names, addresses, telephone numbers, communications,

6   and illegal activities of associates in narcotic trafficking activities . . . ."  ECF No. 95-11 at 39-40;

7   ECF No. 97 at 12.

8         As noted in connection with Li's motions to suppress the state and federal GPS

9   warrants, the affidavit in this case showed that she and Chen were involved with Liu, Peng and

10  others, all of whom had connections to houses with high power usage and some with the

11  appearance, sound, and smell of marijuana growing operations.  Officers found growing

12  equipment in her car, which smelled strongly of marijuana, and after Chen became the utilities

13  subscriber at McKenna in June 2012, the use of electricity climbed, suggesting Chen, Li, and

14  others had begun to use McKenna as another grow site.  *See, e.g.,* ECF No. 95-1 ¶ 19 ("[T]he

15  billing customer for … McKenna Drive was Shihong Chen with service start date of Jun  [*sic*] 1,

16  2012, and a last month power usage of close to 5000 KWH which was very high").   Moreover,

17  "[t]he mere lapse of substantial amounts of time is not controlling in a question of staleness."

18  *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988).   Marijuana cultivation "is a long-term

19  crime", *id*.,  and the magistrate judge could have concluded those involved would have

20  maintained records and equipment and continued growing plants over the span of several months.

21  *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1566 (9th Cir. 1989) (in cases involving

22  "a widespread, firmly entrenched, and ongoing narcotics operation . . . staleness arguments lose

23  much of their force").   In this case, Li's involvement with Liu and others, her visits to other grow

24  houses, the high power consumption at McKenna up to the issuance of the warrant and the smell

25  of marijuana issuing from McKenna support the magistrate judge's determination there was

26  probable cause to search McKenna.

27  /////

28  /////

1        ii.  *Franks* Hearing

2            Li claims that McKenna is a five bedroom house with a swimming pool, a fact

3    omitted from the affidavit but one that could explain the consistently high energy usage.   She

4    also argues that agents failed to include information on the size of neighboring houses, the

5    information suggesting the potential familial relationship between Zhicai Wu and Li, and material

6    suggesting that Chen probably lived at McKenna with several young children.

7            As noted above, Li simply asserts, but presents no evidence, that McKenna is a

8    large house with a pool and presents no evidence about the size of neighboring properties, even

9    though it is her burden to do so.   Moreover, as explained above, none of this other information

10   would have vitiated the showing of probable cause, based on the totality of Li's and Chen's

11   observable involvement with the multi-location growing operation.

12                     c.  Peng's Motion to Suppress

13                         i.  Probable Cause

14           Peng argues investigators merely assumed he grew marijuana because he was

15   friends with people who were connected to houses that appeared to be marijuana cultivation sites

16   and visited those home and visited those homes himself on occasion.   ECF No. 96 at 3.   He

17   contends apart from his association with potential growers, there is little to suggest that his house

18   at Gwerder court was also a grow site.   *Id*. at 4.   He says the only facts tied to Gwerder are these:

19   on October 31, 2012, he carried some lumber into the house and there was some ducting in his

20   garage; in October, the power usage appeared normal at 216 KWH; in November 2, 2012, he

21   unloaded some more lumber and some plywood into the house; in February 2013, the power

22   consumption for Gwerder was 5,872 KWH, but three neighboring houses used only of 444 KWH,

23   834 KWH, and 464 KWH per month.   He emphasizes there was no marijuana found in his trash

24   and no sounds, smell or appearance indicative of cultivation.   He also argues the information

25   about the lumber was stale, as those observations were made three months before the warrant was

26   executed, and the power consumption data is meaningless without a more detailed comparison.

27   ECF No. 96 at 6-7.

28   /////

1          Although the probable cause showing for Gwerder is less robust than it is for

2    McKenna, the totality of the circumstances still support the magistrate judge's probable cause

3    determination.  First, the power consumption information was not meaningless; as noted, in

4    *Clark*, the Ninth Circuit said that an affidavit saying only that power usage was high was

5    insufficient without comparisons with other houses, information provided in this case.  31 F.3d at

6    835.   Second, the observations about the lumber are not stale:  in Swenson's opinion, Peng and

7    Chen purchased lumber typically used to convert a single-family home into a growing operation,

8    *see* ECF No. 95-1 ¶ 31, "improvements" that would typically remain in place throughout the

9    property's use as a cultivation site.  *See Hernandez-Escarsega*, 886 F.2d at 1566.   Third, the

10   affidavit described Peng's contacts with Chen and their visits to Caina and McKenna, other grow

11   sites for which probably cause was established.

12         The Ninth Circuit has said:

13   > In order to find probable cause based on association with persons
> engaging in criminal activity, some additional circumstances from
14   > which it is reasonable to infer participation in criminal enterprise
> must be shown.   One important consideration in assessing the
15   > significance of the association is whether the known criminal
> activity was contemporaneous with the association.   Another is
16   > whether the nature of the criminal activity is such that it could not
> normally be carried on without the knowledge of all persons
17   > present.

18   *United States v. Hillison*, 733 F.2d 692, 697 (9th Cir. 1984) (internal citations omitted).  Here

19   Peng was associating with Chen and others during the time the group was engaged in activity

20   consistent with growing marijuana in various houses in the greater Sacramento area, and he was

21   visiting several of the houses, such as Caina, where investigators had found marijuana in the

22   trash.  These factors go beyond showing mere association and bolster the showing of probable

23   cause established by the energy use and the construction activity at Gwerder.  The warrant was

24   adequately supported.

25                  ii.   *Franks* Hearing

26         Peng requests a *Franks* hearing regarding an alleged material omission of fact

27   from Special Agent Swenson's affidavit supporting the federal search warrant.  ECF No. 96 at 8–

28   9.  Peng notes the affidavit failed to include the specific addresses of the homes against which

1    Gwerder's monthly power usage was compared, and that therefore "[t]he comparisons are useless

2    and, arguably, misleading." *Id.* at 9.  However, Peng has presented nothing suggesting Gwerder

3    was a mansion in a neighborhood of bungalows and so has not borne his initial burden of

4    demonstrating that any omission tended to mislead.

5    II.  THE MOTION TO DISMISS

6                    The defendants have filed a joint motion to dismiss the indictment on the grounds

7    that  the inclusion of cannabis in Schedule I is an arbitrary classification.   They also argue the

8    government's prosecution policy relating to marijuana violates the doctrine of Equal Sovereignty.

9    As they have presented no evidence in support of their arbitrary classification claim and no copy

10   of the government's prosecution policy, they have not supported their motion in a manner that

11   requires the court to reach the merits of their argument.

12                   IT IS HEREBY ORDERED that:

13                   1.  Li's motion to suppress evidence from the state GPS warrant, ECF No. 71, is

14   denied;

15                   2.  Li's motion to suppress evidence from the vehicle stop, ECF No. 79, is denied;

16                   3.  Li's motion to suppress evidence from the federal GPS warrant, ECF No. 80, is

17   denied;

18                   4.  Liu's motion to suppress evidence from the federal GPS warrant,  ECF No. 82,

19   is denied;

20                   5.  The joint motion to dismiss,  ECF No. 87, is denied;

21                   6.  Li's motion to suppress evidence of the sniff searches, ECF No. 94, is denied;

22                   7.  Li's motion to suppress evidence from the federal search warrant, ECF No. 95,

23   is denied; and

24                   8.  Peng's motion to suppress evidence from the federal search warrant, ECF No.

25   96, is denied.

26   DATED:  January 6, 2015.

27

28                                                         _____
                                                          UNITED STATES DISTRICT JUDGE